IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PIPELINE DATA INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 12-13123 (KJC)<br>(Joint Administration Pending)<br><br>Hearing Date: December 19, 2012 at 3:00 p.m.<br>Objection Deadline: December 12, 2012 at 4:00 p.m. |

**APPLICATION OF THE DEBTORS TO EMPLOY AND RETAIN
ALIXPARTNERS, LLP AS THEIR RESTRUCTURING ADVISORS PURSUANT TO
11 U.S.C. § 327(A), *NUNC PRO TUNC* TO THE PETITION DATE**

The above-captioned debtors and debtors-in-possession (each a "Debtor" and, collectively, the "Debtors") file this application (the "Application") for the entry of an order, substantially in the form of Exhibit "A" (the "Proposed Order"), pursuant to section 327(a) of title 11 of the United States Code, authorizing the Debtors to employ and retain AlixPartners, LLP ("AlixPartners"), as restructuring advisors for the Debtors *nunc pro tunc* to the Petition Date (as defined herein). In support of this Application, the Debtors submit the Declaration of David C. Johnston (the "Johnston Declaration"), a copy of which is attached as Exhibit "B" and incorporated by reference herein. In further support of this Application, the Debtors respectfully state as follows:

---

[1] The Debtors include Pipeline Data, Inc. ("Pipeline" EIN 3764), Northern Merchant Services, Inc. ("NMS" EIN 8447), PayPassage, Inc. ("PayPassage" EIN 9467), Paynet Systems, Inc. ("Paynet" EIN 8459), Aircharge, Inc. ("Aircharge" EIN 0259), SecurePay.com, Inc. ("SecurePay" EIN 7961), Pipeline Data Processing, Inc. ("Data Processing" EIN 1090), Valadata, Inc. ("Valadata" EIN 0745), Pipeline Data Portfolio Acquisition, Inc., ("PDPA" EIN 1106), PayPipe, Inc. ("PayPipe" EIN 4816) and CardAccept.com, Inc., ("CardAccept" EIN 7256).

1

### Jurisdiction

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 327(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 and 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

### Background

4. On November 19, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are continuing in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in these Chapter 11 Cases.

### Debtors' Background and Events Leading to Bankruptcy Filings

*A.   Business Overview*

6. Pipeline (defined above in fn. 1) was incorporated in Delaware in 1997. Pipeline, along with its wholly owned subsidiaries (collectively referred to as "Pipeline" or the "Company"), provide credit and debit card payment processing services and other related

merchant services. Pipeline has approximately thirty-six (36) employees, with its headquarters in Alpharetta, Georgia. Pipeline provides services to approximately 15,000 merchants.

7. Pipeline sells its products and services through two separate channels: (i) an in-house sales force, which utilizes multiple lines of origination that include the Internet, call generation and other marketing media and (ii) utilization of contractual relationships with commercial banks and financial institutions and Independent Sales Organizations ("ISOs")/Value Added Resellers ("VARs").

8. Pipeline and its subsidiaries deliver credit and debit card-based payment processing solutions to small and mid-sized merchants that operate in physical "brick and mortar" business environments, over the internet, or in settings that require wired as well as wireless mobile payment solutions.

9. Revenues are derived primarily from the electronic processing of credit, debit, and charge card transactions that are authorized and captured through third-party networks. Typically, merchants are charged for these processing services based on a variable percentage of the dollar amount of each transaction and in some instances additional pre-determined transaction fees are charged for each transaction. These fees are referred to as "interchange fees". Certain merchant customers are charged an annual flat fee and may also be charged additional fees, including statement fees, annual fees, monthly minimums fees, fees for handling payment charge-backs, gateway fees, payment card industry ("PCI") compliance and non-compliance fees and fees for various other services. As an ISO that services both direct merchants and smaller "sub ISOs", Pipeline has processing agreements with First Data Corporation, Elavon, Inc., and Cynergy Data, LLC through which it services its customers. Since its inception, Pipeline enlarged its customer base through merchant portfolio and sales

channel acquisitions as well as through bank referrals, direct sales, independent sales agents, trade and other association affiliations.

10.     Pipeline's internal sales and agent bank relationships are primarily generated through Northern Merchant Services, Inc. ("NMS"), a wholly-owned subsidiary. NMS is an ISO located in Brasher Falls, New York that is engaged in marketing and servicing electronic credit card authorization and payment systems to small and medium-sized merchants located throughout the United States. In addition, NMS maintains agent relationships with approximately 50 banks and other financial institutions through which its services are marketed. The Company also maintains websites under its SecurePay, Aircharge, and CardAccept trade names that also directly accept merchant applications.

11.     In addition to its core processing services, Pipeline has developed two processing related products and services that are marketed both to its existing customers and the marketplace. These are held in two wholly owned subsidiaries: SecurePay and Aircharge.

12.     SecurePay is a custom credit card transaction processor serving as a gateway intermediary between the merchant, consumer customer, and the financial networks for the acceptance of card payments by merchants. SecurePay processes all major card types including Visa, MasterCard, American Express, Discover and JCB. Presently, SecurePay's products include payment gateway solutions, virtual credit card terminals, proprietary shopping carts and wireless payment applications operating over common cell phone networks supporting mobile merchant card acceptance services. The "SecurePay" gateway allows the acceptance of card payments over wireless internet devices such as smartphones and tablets.

13.     The Company's Aircharge products and services enable merchants to benefit from fast and secure mobile card payments, printed receipts, qualified card rates and real-time

batching in one turnkey bundled offering. In addition, Pipeline has established relationships with cellular carriers and merchant processors, enabling it to deliver the most sophisticated mobile payments package and communication options in the industry.

B.  *Events Leading to Filing*

14.  In 2006, Pipeline entered into $37 million convertible notes (the "Notes") and warrants with several institutional investors to refinance its existing debt and to fund acquisitions (the "2006 Financing"). The Notes were to mature four years from the date of issuance and could be converted into Pipeline common stock. The Notes were secured by substantially all of Pipeline's assets and were guaranteed by Pipeline's wholly-owned subsidiaries.

15.  In late 2008, Pipeline was experiencing financial difficulties. In February 2009, ComVest Investment Partners, III ("ComVest"), along with two individual investors, formed investment subsidiary Pipeline Holdings, LLC (now known as Pipeline Cynergy Holdings, LLC ("PCH") and purchased $15 million of Pipeline's Series A Convertible Stock. The 2006 Financing was also restructured, including an extension of the term of the Notes and the elimination of the conversion feature of the Notes. This acquisition gave PCH a majority interest in Pipeline's common stock on an as-converted basis. Further, PCH purchased a portion of the outstanding Notes.

16.  Macroeconomic conditions continued to negatively affect the Company and the industry as a whole. Normal industry attrition rates spiked, merchant closures increased, and new merchant origination channels weakened. The Company was unable to identify and acquire merchant portfolios and sales channels on terms that would improve its financial condition.

17. In the second half of 2010, Pipeline's processing and technology partner, Fidelity Information Systems ("FIS"), exited the processing business and shut down operations, forcing Pipeline to abandon its technology investment and to pursue an alternative strategy.

18. As a result of the deteriorating conditions of operations, prior to the Petition Date, the Debtors hired AlixPartners, LLP ("AlixPartners") to assess and advise the Company on its restructuring options. Pipeline ultimately determined that a sale of its business as a going concern would be in the best interests of creditors and other parties in interest. The Company also engaged Dragonfly Capital LLP to work with AlixPartners to market and sell the Pipeline business as a going concern. Pipeline has determined that a structured sale process with defined milestones under the protections of chapter 11 would be the quickest and most efficient way to effectuate a sale of substantially all of Pipeline's assets in a manner that will maximize proceeds to benefit creditors. Pipeline has identified a purchaser for its business and intends to pursue Bankruptcy Court approval of the sale, subject to any higher and better offers that may be received in accordance with Section 363 of the Bankruptcy Code.

### Relief Requested

19. By this Application, the Debtors seek entry of an order authorizing the employment and retention of AlixPartners pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-2 as their restructuring advisor, *nunc pro tunc* to the Petition Date, for the Debtors in these Chapter 11 Cases (as defined in the Johnston Declaration) upon the terms and conditions contained in that certain letter dated as of February 17, 2012, between AlixPartners and the Debtors (such letter, together with all attachments and amendments thereto, the "Engagement Letter"), a copy of which is attached as Exhibit "C" and incorporated by reference herein.

## AlixPartners' Qualifications

20. The Debtors are familiar with the professional standing and reputation of AlixPartners. The Debtors understand that AlixPartners has a wealth of experience in providing restructuring advisory services, and enjoys an excellent reputation for services it has rendered in complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

21. AlixPartners is well-suited to provide the restructuring services required by the Debtors. AlixPartners' professionals have assisted and advised, and provided strategic advice to, debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of varying size and complexity including middle-market companies similar to the Debtors' Chapter 11 Cases. Since its inception in 1981, AlixPartners, its predecessor entities, and its subsidiary affiliates, including AP Services, LLC, have provided restructuring or crisis management services in numerous large cases, including most recently:[2] In re CHL, Ltd., Case No. 12-12437 (KJC) (Bankr. D. D. Aug. 29, 2012); In re Pemco World Air Services, Inc., Case No. 12-10799 (MFW) (Bankr. D. Del. March 5, 2012); In re Neb. Book Co., Inc., Case No. 11-12005 (PJW) (Bankr. D. Del. June 27, 2011); In re AbitibiBowater, Case No. 09-11296 (KJC) (Bankr. D. Del. July 7, 2009); In re Trico Marine Servs., Inc., Case No. 10-12653 (BLS) (Bankr.D. Del. Oct. 6, 2010); In re U.S. Concrete, Inc., Case No. 10-11407 (PJW) (Bankr. D. Del. May 21, 2010); In re Jones Stephens, Corp., Case No. 09-14413 (CSS) (Bankr. D. Del. January 26, 2010); In re Stallion Oilfield Serv. Ltd., Case No. 09-13562 (BLS) (Bankr. D. Del. Nov. 16, 2009); In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Sept. 10, 2009); In re MMC Precision Holdings, Case No. 09-10998 (BLS) (Bankr. D. Del. December 9, 2008); In re Motor

---

[2] Because of the voluminous nature of the orders cited herein, they are not attached to the Application. Copies of these orders are available on request of the Debtors' counsel.

Coach Indus. Int'l, Case No. 08-12136 (BLS) (Bankr. D. Del. Aug. 18, 2009); In re Nailite International, Case No. 09-10526 (MFW) (Bankr. D. Del. March 12, 2009); In re SemCrude, L.P., Case No. 08-11525 (BLS) (Bankr. D. Del. Aug. 18, 2008); In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. Aug. 12, 2008); In re Hilex Poly Co., LLC, Case No. 08-10890 (KJC) (Bankr. D. Del. May 30, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008); In re Charys Holding Co., Inc., Case No. 08-10289 (BLS) (Bankr. D. Del. Mar. 7, 2008); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. June 15, 2007); In re Remy Worldwide Holdings, Inc., Case No. 07-11481 (KJC) (Bankr. D. Del. Nov. 5, 2007); In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 5, 2007); see also, In re Metro Fuel Oil Corp., Case No. 12-46913 through 12-46922 (ESS) (*Retention Pending*); In re Eastman Kodak Company, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. 2012); In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 10, 2009); In re Motors Liquidation Co., Case No. 09-50026 (REG) (Bankr. S.D.N.Y. July 2, 2009); In re Gen. Growth Props., Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. July 13, 2009); In re Charter Commc'ns, Inc., Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009); In re Bally Total Fitness of Greater N.Y., Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Dec. 22, 2008); In re Dana Corp., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 27, 2006).

22.   The Debtors have selected AlixPartners as their restructuring advisor because of AlixPartners' experience and reputation for providing restructuring advisory services in chapter 11 cases such as those listed above. Furthermore, as a result of the prepetition work performed on behalf of the Debtors, AlixPartners acquired significant knowledge of the Debtors and their

businesses and is now intimately familiar with the Debtors' financial affairs, debt structure, operations, and related matters. Likewise, in providing prepetition services to the Debtors, AlixPartners' professionals have worked closely with the Debtors' management and their other advisors. Accordingly, AlixPartners has experience and expertise, and specifically relevant knowledge regarding the Debtors that will assist it in providing effective and efficient services in these Chapter 11 Cases.

### Scope of Services

23. Subject to further order of this Court and consistent with the Engagement Letter, the Debtors request the employment and retention of AlixPartners to render the following restructuring and advisory services:

- Advise senior management and the Board of Directors in the negotiation and implementation of restructuring initiatives and evaluation of strategic alternatives;
- Assist the Debtors to develop contingency plans and financial alternatives;
- Assist in developing and implementing cash management strategies, tactics and processes including developing a short-term cash flow forecasting tool and related methodologies and to assist with planning for alternatives;
- Assist in negotiations with potential acquirers of Debtors' assets;
- Assist in communication and/or negotiation with outside constituents including the banks and their advisors;
- Assist the Debtors with various motions and pleadings to be filed in these chapter 11 bankruptcy proceedings, and render testimony, as requested from time to time, regarding any of the matters to which AlixPartners is providing services;
- Assist the Debtors in the preparation of a Plan of Reorganization and Disclosure Statement;
- Assist the Debtors with the preparation of its statement of financial affairs, schedules, monthly operating reports and other regular reports required in thsee chapter 11 bankruptcy proceedings and in contract rejection analysis;
- Assist with such other matters as may be requested that fall within AlixPartners' expertise and that are mutually agreeable;

9

24. The Debtors and AlixPartners intend that all of the services that AlixPartners will provide to the Debtors will be: (a) appropriately directed by the Debtors so as to avoid duplicative efforts among the other professionals retained in these Chapter 11 Cases and (b) performed in accordance with applicable standards of the profession.

25. Under the Engagement Letter, in the event that AlixPartners finds it desirable to augment its professional staff with independent contractors (each, an "Independent Contractor") in these Chapter 11 Cases, then (a) AlixPartners will file, and require the Independent Contractor to file, declarations indicating that the Independent Contractor has reviewed the list of the interested parties in this case, disclosing the Independent Contractor's relationships, if any, with the interested parties, and indicating that the Independent Contractor is disinterested, (b) the Independent Contractor will remain disinterested during the time that AlixPartners is involved in providing services on behalf of the Debtors, and (c) the Independent Contractor will represent that he/she will not work for the Debtors or other parties in interest in these Chapter 11 Cases during the time AlixPartners is involved in providing services to the Debtors. AlixPartners' standard practice is to charge for an Independent Contractor's services at the rate AlixPartners pays the Independent Contractor for such services.

### Professional Compensation

26. AlixPartners' decision to accept this engagement to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment and compensated for its services and reimbursed for the out-of-pocket expenses it incurs in accordance with its customary billing practices.

27. AlixPartners intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these Chapter 11 Cases, subject to this Court's approval and in compliance with applicable provisions of the Bankruptcy Code,

including Sections 330 and 331, the Bankruptcy Rules, the Local Rules, the guidelines established by the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee Guidelines</u>"), and any other applicable procedures and orders of this Court and consistent with the proposed terms of compensation set forth in the Engagement Letter (all such proposed terms, the "<u>Fee Structure</u>") to which the Debtors respectfully refer this Court for a full recitation of the Fee Structure and the terms and conditions related thereto.

28. The standard hourly rates, subject to periodic adjustments, charged by AlixPartners in respect of the professionals anticipated to be assigned to this case are as follows:

| | |
|---|---|
| Managing Directors | $ 815 - 970 |
| Directors | $ 620 - 760 |
| Vice Presidents | $ 455 - 555 |
| Associates | $ 305 - 405 |
| Analysts | $ 270 - 300 |
| Paraprofessionals | $ 205 - 225 |

29. In addition to compensation for professional services rendered by AlixPartners personnel, AlixPartners will seek reimbursement for reasonable and necessary expenses incurred in connection with these Chapter 11 Cases, including transportation costs, lodging, food, telephone, copying, and messenger services.

30. AlixPartners typically works for compensation that includes hourly-based fees and performance-based contingent incentive compensation earned upon achieving meaningful results. In these Chapter 11 Cases, however, AlixPartners has not required contingent incentive compensation.

31. AlixPartners will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in these Chapter 11 Cases by category and nature of the services rendered and reasonably detailed descriptions of those

services provided on behalf of the Debtors, the approximate time expended in providing those services (in 1/10th of an hour increments) and the individuals who provided professional services on behalf of the Debtors and will present such records to the Court.

32. The Fee Structure is consistent with and typical of compensation arrangements entered into by AlixPartners and other comparable firms in connection with the rendering of similar services under similar circumstances. The Debtors believe that the Fee Structure is in fact reasonable, market-based, and designed to fairly compensate AlixPartners for its work and to cover fixed and routine overhead expenses.

33. AlixPartners received an initial advance retainer of $200,000.00 (the "Retainer") on February 22, 2012 from the Debtors. Pursuant to the Engagement Letter, invoiced amounts have been recouped against the Retainer, and payments on the invoices have been used to replenish the Retainer. During the 90 days prior to commencement of these Chapter 11 Cases, Debtors paid AlixPartners a total of $946,315.00, incurred in providing services to the Debtors in contemplation of, and in connection with, prepetition restructuring activities.

34. Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the Petition Date, AlixPartners has incurred but unbilled fees and reimbursable expenses which relate to the prepetition period. AlixPartners hereby seeks this Court's approval to apply the Retainer to these amounts and any further prepetition fees and expenses AlixPartners becomes aware of during its ordinary course billing review and reconciliation. Upon the proposed applications of the Retainer, the Debtors would not owe AlixPartners any sums for pre-petition services.

35. The remainder of the Retainer will constitute an evergreen retainer as security for post-petition services and expenses. An evergreen retainer is appropriate in these Chapter 11

Cases. First, evergreen retainer agreements reflect normal business terms in the marketplace. See, In re Insilco Techs., Inc., 291 B.R. 628, 634 (Bankr. D. Del. 2003)("it is not disputed that the taking of evergreen retainers is a practice now common in the marketplace . . . [and] the practice in this district has been engaged in since at least the early 1990s"). Second, AlixPartners and the Debtors are sophisticated business entities that have negotiated the Retainer at arm's length. Approval of the proposed evergreen retainer is thus warranted under the standards articulated in Insilco. Id.

## INDEMNIFICATION PROVISIONS

36. The Engagement Letter contains standard indemnification language with respect to AlixPartners' services including, without limitation, an agreement by the Debtors to indemnify AlixPartners, its affiliates, and its partners, directors, officers, owners, employees, and agents from and against all claims, liabilities, losses, expenses, and actual damages arising out of or in connection with the engagement of AlixPartners that is the subject of the Engagement Letter.

37. The Debtors and AlixPartners believe that the indemnification provisions contained in the Engagement Letter are customary and reasonable for AlixPartners and comparable firms providing restructuring advisory services. Indeed, the indemnification provisions contain certain qualifications and limitations that are customary in this district and others. See, e.g., In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011) (approving similar modified indemnification provisions for the retention and employment of Alvarez & Marsal North America, LLC); In re Local Insight Media Holdings, Inc., Case No. 10-13677 (KG) (Bankr. D. Del. Dec. 17, 2010) (same); In re Atrium Corp., Case No. 10-10150 (BLS) (Bankr. D. Del. Feb. 24, 2010) (approving similar modified indemnification provisions for the retention and employment of Deloitte Financial Advisory Services LLP); In re Majestic Star Casino, LLC, Case No. 09-14136 (KG) (Bankr. D. Del. Dec.

17, 2009) (approving similar modified indemnification provisions for the retention and employment of Moelis & Company LLC); In re Muzak Holdings LLC, Case No. 09-10422 (KJC) (Bankr. D. Del. Apr. 6, 2009) (approving similar modified indemnification provisions for the retention and employment of Moelis & Company LLC); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Jan. 12, 2006) (approving similar modified indemnification provisions for the retention and employment of Miller Buckfire & Co., LLC).

38. Moreover, the terms and conditions of the indemnification provisions were negotiated by the Debtors and AlixPartners at arm's length and in good faith. The provisions contained in the Engagement Letter, viewed in conjunction with the other terms of AlixPartners' proposed retention, are reasonable and in the best interest of the Debtors, their estates, and creditors in light of the fact that the Debtors require AlixPartners' services to successfully reorganize. Accordingly, as part of this Application, the Debtors request that the Court approve the indemnification provisions as set forth in the Engagement Letter, as may be amended by the Proposed Order.

### AlixPartners' Disinterestedness

39. AlixPartners has reviewed its electronic database and, to the best of its knowledge and except to the extent disclosed in the Johnston Declaration and exhibits thereto, AlixPartners (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, (b) does not hold or represent an interest adverse to the Debtors' estates, and (c) has no connection to the Debtors, their creditors, or their related parties that would negatively impact AlixPartners' disinterestedness.

40. AlixPartners will periodically review its files during the pendency of these Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. To the extent that AlixPartners discovers any new relevant facts or relationships bearing on the

matters described herein during the period of AlixPartners' retention, AlixPartners will use reasonable efforts to file promptly a supplemental declaration.

### Basis for Relief

41. Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval:

> May employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

11 U.S.C. § 327(a).

Bankruptcy Rule 2014 requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

### Notice

42. Notice of the filing of this Motion has been provided to the following persons, or in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the largest twenty unsecured creditors of the Debtors; (c) counsel to any known secured creditors of record; and (d) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002 and such other government agencies to the extent required by the applicable rules. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

43. No prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as Exhibit "A", (a) approving the employment and retention of AlixPartners as restructuring advisors for the Debtors and (b) granting such other and further relief as the Court deems appropriate.

Dated: November 28, 2012

Pipeline Data Inc., on behalf of itself and its subsidiaries: Northern Merchant Services, Inc.; PayPassage, Inc.; Paynet Systems, Inc.; Aircharge, Inc.; SecurePay.com, Inc.; Pipeline Data Processing, Inc.; Valadata, Inc.; Pipeline Data Portfolio Acquisition, Inc.; PayPipe, Inc.; and CardAccept.com, Inc.

By: /s/ Philip Mazzilli

Name: Philip Mazzilli